JUANA MARTÍNEZ ET AL., demandantes y recurrentes, *v.* ANTONIA PÉREZ VDA. de MARTÍNEZ ET AL., demandados y recurridos.

*Número:* 93    *Resuelto:* 24 de mayo de 1963

*Celestino Iriarte, H. González Blanes* y *F. Fernández Cuyar,* abogados de los recurrentes; *Rodolfo F. Aponte,* abogado de Antonia Pérez Vda. de Martínez; *Canales & Segarra* y *José F. Quetglas Álvarez,* abogados de Duilio Martínez.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

Los protagonistas principales y sus roles en este caso son Luis Martínez, el causante, puertorriqueño y padre; Mercedes Vázquez, venezolana y madre; y Duilio Martínez, hijo de los antes nombrados Luis y Mercedes.

César Núñez y Mercedes Vázquez, venezolanos ambos, contrajeron matrimonio en Caracas en febrero de 1939, teniendo él entonces 21 años y ella catorce. A la celebración del matrimonio compareció la madre de Mercedes a dar formalmente su consentimiento por ser la contrayente menor de edad. A los pocos meses de casados "me separé del hogar" explica Núñez[1] yéndose a vivir al Perú en septiembre de 1939, sin que regresara a Venezuela hasta siete años más tarde, en el 1947. Mercedes quedó en Caracas con su madre. Los jóvenes esposos no tuvieron hijos.

En 15 de octubre de 1943 Mercedes instó demanda de divorcio por abandono en Caracas; el tribunal designó curadora de Mercedes a su señora madre, por razón de ser aquélla menor, y dio las órdenes pertinentes para la citación de las partes. No tenemos más noticias de este procedimiento.

Mercedes Vázquez y el causante, Luis Martínez, llevaron relaciones concubinarias y de esas relaciones nació en Caracas un niño el 6 de junio de 1944. Ese año el menor fue inscrito en el Registro Civil de Nacimientos en Caracas como hijo natural de Mercedes Vázquez, soltera, de 20 años de edad. Aparece de los autos que el causante no abandonó a su hijo, sino que por el contrario, lo atendió con la solicitud de un buen padre y finalmente siendo todavía un niño de pocos años de edad lo trajo al hogar que constituyó más tarde en Puerto Rico con su esposa puertorriqueña, en donde el menor quedó al cuidado de la viuda al morir Martínez.

En el 1946 el causante, residiendo todavía en Caracas, inició un procedimiento de legitimación ante la Corte Suprema

---

[1] En su demanda de desconocimiento de paternidad, a la que más tarde haremos referencia.

del Distrito Federal en Caracas "con el propósito de legitimar a mi menor hijo natural Duilio Vázquez a quien reconozco como tal. . . ." Compareció al procedimiento la madre del niño a dar su consentimiento "para que mi nombrado menor hijo sea legitimado por su padre natural, señor Luis Martínez." Martínez había sido casado con Modesta Ortiz, quién había fallecido en Venezuela en abril de 1945. El 4 de octubre de 1946 el tribunal venezolano, luego de los trámites de rigor, decretó "la legitimación solicitada, y en tal virtud adquirida por el menor Duilio Martínez (antes Vázquez) la condición jurídica de hijo legítimo de Luis Martínez. . . ."

El causante otorgó testamento cerrado en Caracas el 19 de enero de 1953 instituyendo como herederos a su hijo Duilio Martínez, a su hermana Providencia Martínez, a su sobrino Pedro Matos y a su esposa Antonia Pérez. No se cuestiona la legitimidàd del testamento (Exhibit III de ambas partes). Corroborando lo antes dicho sobre la solicitud del padre para con su hijo, veamos cómo se expresó el causante, en parte, en su testamento:

> "Es mi heredero legitimario mi menor hijo Duilio Martínez, presentado ante la Jefatura Civil de la Parroquia Santa Teresa, con el nombre de Duilio Vázquez pero posteriormente legitimado por mí, previa las formàlidades legales, conforme a decreto emanado de la Corte Suprema del Distrito Federal. Poseo en la actualidad bienes en la República de Venezuela y en Puerto Rico y es mi primera disposición que la cuota que a mi dicho hijo corresponda de acuerdo con las leyes respectivas de dichos países por concepto de legítima sea respetada."
>
> ". . . Como mi menor hijo Duilio quien vive conmigo se encuentra en edad muy tierna y en previsión de que la futura administración de los bienes que le corresponden puedan comprometer o peligrar sus intereses, ruego a mis herederos instituidos y a mis amigos Dr. Domingo Antonio Coromil y señor Mariano Rivero F. contribuir en forma que se conserven los bienes del menor a fin de que los reciba al llegar a la mayor edad y que los intereses o rentas de ellos contribuyan a su educación y sostenimiento."

Falleció Martínez en San Juan, Puerto Rico, el 27 de diciembre de 1954, bajo el testamento antes indicado, estando casado con Antonia Pérez de Martínez. Tenía el matrimonio su residencia en Villa Caparra, Guaynabo, Puerto Rico y con ellos vivía, desde que se casaron, Duilio, quién a la muerte de su padre tenía 10 años de edad.

En el 1955 falleció Doña Martina Martínez, madre del causante, y en septiembre de ese año los demandantes, cuatro tíos y un primo de Duilio (cuatro hijos y un nieto de Doña Martina) radicaron en San Juan una demanda sobre nulidad de institución de herederos y otros extremos reclamando para ellos la herencia de Luis Martínez.

Debido a que los demandantes le imputaron a César Núñez la paternidad de Duilio, en 29 de enero de 1957 Núñez instó en Caracas una acción de desconocimiento de paternidad en la cual se expresó, en parte como sigue:

> "Apenas conviví con mi esposa menos de un año y debido a las graves dificultades que entre nosotros con frecuencia se suscitaban, me separé del hogar antes de cumplir el año de convivencia, y desde entonces no volví a tener contacto de ninguna naturaleza con mi citada esposa. Ahora bien, durante el corto tiempo del matrimonio mi esposa y yo no procreamos hijos y después de mi separación del hogar no volví jamás a tener contacto con mi esposa ni material ni moral ni de ninguna clase. Debido a esa circunstancia me ha sorprendido saber que se me imputa de la paternidad de un hijo natural de mi esposa, de nombre Duilio . . ." (Exhibit IV de ambas partes.)

En 4 de junio de 1957 el tribunal venezolano declaró con lugar dicha acción de desconocimiento de paternidad instada por Núñez y en consecuencia declaró que el menor Duilio Martínez no es hijo legítimo de César Núñez. (Exhibit IV.)

En síntesis, los demandantes alegaron en su demanda lo siguiente: (a) Que Luis Martínez no dejó descendientes de clase alguna; que dejó como única ascendiente a su madre Martina Martínez, quien falleció en 1955, dejando como únicos

y universales herederos a sus hijos y a un nieto, o sea, a los demandantes.

(b) Que la institución de herederos contenida en el testamento de Luis Martínez es nula y sin valor, por haber preterido como heredera suya a su madre Martina Martínez; por ser falso que el menor Duilio fuera hijo del referido causante; por ser nulo el reconocimiento que del menor hiciera Luis Martínez de acuerdo con las leyes de Venezuela, porque no tuvo el consentimiento del padre legítimo de dicho menor; y porque al tiempo de la concepción, nacimiento y reconocimiento del referido menor sus padres legítimos se hallaban casados.

El Tribunal Superior dictó una primera sentencia declarando con lugar la demanda, y los demandados interpusieron mociones de reconsideración, extensamente argumentadas. El tribunal, luego de darle cuidadoso estudio a las alegaciones y alegatos de las partes, según explica, concluyó que debía dejar sin efecto su anterior fallo y así lo hizo mediante su Sentencia de 18 de noviembre de 1959, y declaró sin lugar la demanda.

Los demandantes señalan que el tribunal de instancia erró (1) al determinar que el causante estaba domiciliado en Puerto Rico; (2) al no concluir que el domicilio del menor era Venezuela; y (3) al no concluir que el reconocimiento del menor hecho por el causante es inexistente y que en consecuencia el domicilio del menor es Venezuela y las leyes de dicho país determinan su status.

Desde luego, son frívolos los planteamientos de los demandantes en el sentido (a) de que Luis Martínez no dejó descendientes de clase alguna y (b) que es falso que el menor Duilio fuese hijo suyo. El punto aquí envuelto realmente consiste en determinar el status del menor, pues una vez determinado podremos concluir si es o no heredero, y en caso de serlo, qué clase de heredero es.

■ El domicilio de origen del causante era Puerto Rico. Aquí nació; aquí se casó por primera vez, con una puertorriqueña. Vivió e hizo negocios en Puerto Rico y Venezuela. Estando en Venezuela enviudó. Luego de nacer su hijo testó en Venezuela. (Claro, el testar en Venezuela de por sí no le varió su domicilio. No se testa para cambiar de domicilio sino como medida previsora, y quizás especialmente es así si uno se encuentra fuera de su domicilio.) Luego regresó Martínez a Puerto Rico donde volvió a casar con puertorriqueña otra vez, hogar adonde trajo a vivir a su hijo, y aquí se quedó hasta su muerte. El hecho de que el causante firmase algunos documentos en Venezuela en donde se dice que está domiciliado en Venezuela no nos convence, como tampoco convenció al tribunal de instancia, de que el causante quiso cambiar de domicilio. Más bien, el significado de esa frase en esos documentos es que él residía en Venezuela. Como se sabe, se puede tener más de una residencia pero sólo un domicilio, *Fiddler* v. *Srio. de Hacienda*, 85 D.P.R. 316 (1962). El domicilio puede variarse sólo mediante la concurrencia de la presencia física y la intención de permanecer en el nuevo lugar, Art. 11, Cód. Político; 1 L.P.R.A. sec. 8; *González Miranda* v. *Santiago*, 84 D.P.R. 380 (1962); *González* v. *Srio. de Hacienda*, 76 D.P.R. 135, 141 (1954); *Enjuto* v. *Corte*, 49 D.P.R. 370, 373 (1936); *Restatement, Conflict of Laws*, Draft No. 2 (1954), sec. 15. La intención debe ser la de realmente querer establecer un hogar, *Restatement*, supra, sec. 19. Véase además Leflar, *The Law of Conflict of Laws* (1959) pág. 15; Graveson, *The Conflict of Laws* (1955) pág. 78; Stumberg, *Conflict of Laws* (1951) pág. 20; Goodrich, *Conflict of Laws*, 3ra. ed. (1949) pág. 50. No hay prueba de que el causante quisiese variar su domicilio de origen y hacer de su residencia en el extranjero un nuevo domicilio; la prueba sostiene lo contrario, que es la conclusión a que llegó el tribunal sentenciador. No se cometió el primer error señalado.

Dirijamos nuestra atención ahora a los dos últimos errores señalados relativos a cuál es el domicilio del menor y a cuál es la ley aplicable. Están tan relacionados entre sí que los discutiremos conjuntamente. No hay duda de que hubo reconocimiento de su hijo Duilio por parte del causante. Primero, en 1946, éste llevó con éxito un procedimiento judicial para reconocer a su hijo. Los demandantes atacan la validez de la sentencia del tribunal venezolano al respecto. No es necesario entrar a discutir ese punto pues no es determinante si hubo sentencia válida o no. Lo determinante es si hubo reconocimiento. Es claro que en ese procedimiento público y oficial el causante reconoció a su hijo. Algo análogo en cuanto al principio, aunque no en cuanto a los hechos, resolvimos en *Iturrino* v. *Iturrino*, 24 D.P.R. 467, 471 (1916.(²) Segundo, si nos olvidamos del reconocimiento antes mencionado todavía tenemos el dato incontrovertido de que el causante reconoció a su hijo en su testamento indubitado. El testamento es un medio por excelencia de reconocimiento voluntario de hijo, *Cortés* v. *Cortés*, 73 D.P.R. 693, 703 (1952). Para mayor diafanidad y para eliminar la presunción de paternidad de parte del padre putativo, César Núñez, recuérdese que éste llevó, con éxito, una acción judicial para negar la paternidad del menor. Además, los hechos hacen inescapable la veracidad de la posición de Núñez: él se fue para Perú en 1939; la madre del menor quedó en Venezuela; ellos no volvieron a tener relación de clase alguna; el menor nació en el 1944; Núñez regresó a Venezuela en el 1947.

■ Tratándose como se trata de un padre* que reconoce a su hijo, es el estatuto personal de dicho padre el que deter-

---

(²) Véase *Restatement Second, Conflict of Laws*, sec. 140, comentario (c): "The place where the legitimating act takes place is unimportant. it is only necessary that the effect of this act is to legitimate the child under the law of the state of the domicil of the parent concerned."

*La palabra "padre" utilizada en este contexto, conforme al uso en idioma español incluye al femenino también. Al traducir al inglés debe escribirse *"parent"* que también incluye ambos sexos.

mina el status del hijo, *Howells* v. *Limbeck*, 175 N.E.2d 517 (1961); *In Re Craven's Estate*, 268 P.2d 236 (1954); *In Re Stater's Estate*, 90 N.Y.S.2d 546 (1949); Anotación en 87 A.L.R.2d 1274, 1296, sec. 12. En el muy citado caso de *Blythe* v. *Ayres*, 31 Pac. 915 (1892) la menor estaba domiciliada en Inglaterra. El padre domiciliado en California la reconoció. El Tribunal Supremo de California la declaró legitimada conforme a la ley de California aunque ello no hubiese sido posible conforme a la Ley de Inglaterra. En *Moen* v. *Moen*, 92 N.W. 13 (1902), otro caso muy citado en la literatura sobre el particular, Moen domiciliado en Noruega reconoció por escrito a su hija. La ley de Noruega no le permitía hacerlo pero el tribunal de Dakota del Sur (E.U.) declaró que ese acto de Moen demostró que la niña era su hija y por lo tanto heredaba la propiedad inmueble que en la Dakota del Sur dejó Moen. La tendencia ortodoxa, universal o casi universal, es en el sentido antes indicado: el estatuto personal del padre que reconoce determina la filiación del hijo reconocido. Véase *Restatement of the Law Second, Conflict of Laws*, secs. 137, 138 y 140; *Restatement, Conflict*, sec. 137; Ehrenzweig, *Conflict of Laws*, West Publishing Co. (1962) pág. 394; Leflar, obra citada, 344; Stumberg, obra citada, 330; Cheshire, *Private International Law*, 5a. ed. (1957) pág. 407; Graveson, obra citada, 152; Rabel, obra citada, 630; Goodrich, obra citada, 434; Beale, *The Conflict of Laws* (1935), Vol. II, pág. 711; Reseña en 13 W. Res. L. Rev. 446 (1961).[3]

[3] Para otros trabajos sobre el particular puede verse Ester, *Illegitimate Children and Conflict of Laws*, 36 Ind. L.J. 163 (1961); Baxter, *Recognition of Status in Family Law*, 39 Can. B. Rev. 301 (1961); Lasok, *Legitimation, Recognition and Affiliation Proceedings*, 10 Int'l & Comp. L.Q. 123 (1961); Guttman, *Whither Legitimacy; An Investigation of the Choice of Law Rules to Determine the Status of Legitimacy*, 14 Rutgers L. Rev. 764 (1960); Guttman, *The Status of Legitimacy in Comparative Conflict of Laws*, 8 Int'l & Comp. L.Q. 678 (1959); Mann, *Legitimacy and the Conflict of Laws*, Reseña en 64 L.Q. Rev. 199 (1948); Welsh, *Legitimacy in the Conflict of Laws*, 63 L.Q. Rev. 65 (1947); Mann, *Legitimation and Adoption in Private International Law*, 57 L.Q. Rev. 112 (1941); Stumberg, *The Status of Children in the Conflict of Laws*, 8 U. Chi. L. Rev. 42 (1940);

Estamos frente a una situación en que cualquiera de las dos grandes tradiciones jurídicas que apliquemos—el derecho civil continental europeo o el derecho común anglosajón—el resultado sería el mismo: se aplicaría la ley de Puerto Rico. Como es sabido, para determinar en una situación como la de autos cuál es el estatuto personal aplicable, la tradición civilista sigue la doctrina de la nacionalidad y el derecho común sostiene la doctrina del domicilio.

En el presente, la mayoría de los países sigue el principio de la nacionalidad y así lo ha seguido la Conferencia de la Haya sobre Derecho Internacional Privado. La teoría de la nacionalidad parece más completa desde el punto de vista teórico pero la teoría del domicilio resulta más práctica, y para los países que, en una forma u otra, forman parte de un sistema federal la teoría del domicilio parece ser la indicada. Esto es así porque aunque para fines internacionales los ciudadanos de una federación tienen una ciudadanía federal, para fines internos y para fines relacionados con áreas jurídicas en las cuales no hay legislación federal aplicable existe la ciudadanía local o estatal. Esta dualidad de ciudadanías, inherente en los sistemas federales, hizo necesario que esos sistemas adoptasen la teoría territorial o del domicilio. Por ejemplo, en el caso de autos aunque Martínez era ciudadano de la federación de Estados Unidos de América, no hay un estututo federal sobre relaciones de familia sino que se aplica la ley del estado, en este caso la ley de Puerto Rico. Debido a esa dualidad de jurisdicciones que contienen dentro de sí los sistemas federales, éstos siguen la doctrina del domicilio. Para un buen resumen de esta situación véase Reed, *Domicile and Nationality in Comparative Conflict of Laws*, 23 U. Pitt. L. Rev. 979 (1962). También sobre el particular puede verse Gallardo, *La Ley del Domicilio: Punto de Conexión Admirable*

---

Taintor, *Legitimation, Legitimacy and Recognition in the Conflict of Laws*, 18 Can. B. Rev. 589 (1940) y en *Selected Readings on Conflict of Laws*, post, pág. 843.

*en el Derecho Internacional Privado Latinoamericano,* 2 Inter-American L. Rev. 15 (1960) ; (⁴) Rabel, *The Conflict of Laws,* (1945) Vol. I, Capítulos 4 y 5; Goodrich, *Conflict of Laws,* 3ra. ed. (1949) ; y los trabajos que aparecen en el Capítulo I de la excelente colección *Selected Readings on Conflict of Laws* ed. por la Asociación de Escuelas de Derecho Americanas (Association of American Law Schools), 1956.

■ Como dijimos, en el caso de autos cualquiera de las dos tradiciones, la civilista o la del derecho común, produciría el mismo resultado porque si seguimos la tradición civilista (doctrina de la nacionalidad) el estatuto personal de Martínez sería la legislación de Puerto Rico y si seguimos el derecho común (la doctrina del domicilio) también es la ley de Puerto Rico la aplicable. Desde luego, en nuestra jurisdicción el domicilio determina el estatuto personal, *Lókpez* v. *Sotelo,* 70 D.P.R. 501, 506 (1949) ; *Lókpez* v. *Fernández,* 61 D.P.R. 522, 533 (1943), y como el domicilio del causante era Puerto Rico, es la ley de Puerto Rico la que determina el status del menor Duilio Martínez.

■ Réstanos aplicar al caso la ley de Puerto Rico. Son principios bien establecidos en Puerto Rico que los derechos hereditarios de las personas se determinan por la ley vigente a la fecha de la muerte del causante (⁵) y que el status filiatorio se rige por la ley vigente a la fecha del nacimiento de la persona cuyo status está en discusión. (⁶)

---

(⁴) En esa misma revista aparece también el texto inglés de ese trabajo.

(⁵) *Ab Intestado de Ana Garroti,* 79 D.P.R. 190, 191 (1956) ; *Silva* v. *Doe,* 75 D.P.R. 209, 216 (1953) ; *Cancel* v. *Martínez,* 74 D.P.R. 108, 115 (1952) ; *Travieso* v. *Del Toro,* 74 D.P.R. 1009, 1014 (1953) ; *Febre* v. *Febre,* 40 D.P.R. 219, 224 (1929) ; *Ex Parte Smith,* 14 D.P.R. 664, 671 (1908).

(⁶) *Sánchez* v. *Díaz,* 78 D.P.R. 811, 816 (1955) ; *Silva* v. *Doe,* 75 D.P.R. 209, 218 (1953)) ; *Torres* v. *Sucn. Cautiño,* 70 D.P.R. 646, 652 (1949) ; *Toro* v. *Ríos,* 68 D.P.R. 760, 761 (1948) ; *Mercado* v. *Sucn. Mangual,* 35 D.P.R. 422, 423 (1926) ; *Morales* v. *Sucn. Cerame,* 30 D.P.R. 843 (1922) ; *Méndez* v. *Martínez,* 21 D.P.R. 252, 266 (1914) ; *Charres* v. *Arroyo,* 16 D.P.R. 816, 821 (1910).

454

El menor Duilio nació en el 1944 estando ya en vigor la Ley Núm. 229 de 12 de mayo de 1942, Leyes de ese año, pág. 1297, 31 L.P.R.A. sec. 501, la cual dispuso en su sección primera que *"serán hijos naturales* todos los hijos nacidos fuera de matrimonio con posterioridad a la fecha de vigencia de esta Ley, independientemente de que sus padres hubieren podido o no contraer matrimonio al tiempo de la concepción de dichos hijos." . . . (Subrayado nuestro.) Dichos hijos, añade la citada Ley Núm. 229 en su sección segunda, podrán ser reconocidos por acción voluntaria de sus padres. Duilio, como antes vimos, fue reconocido voluntariamente por su padre.

El causante falleció en el 1954, cuando ya regía la Ley Núm. 447 de 14 de mayo de 1947, Leyes de ese año, pág. 945, 31 L.P.R.A. sec. 2362, que excluyó, en una herencia testada, los derechos hereditarios de los padres legítimos cuando existan hijos naturales reconocidos, *Ex Parte Orona Acevedo,* 87 D.P.R. 840 (1963); *Travieso* v. *Del Toro,* 74 D.P.R. 1009, 1014 (1953); *Sánchez* v. *Corte,* 69 D.P.R. 493, 498 (1949). En virtud de esta Ley Núm. 447 de 1947 y de lo ya operado bajo la 229 de 1942, el menor Duilio es el heredero forzoso y universal de su padre. (⁷)

El tribunal de Venezuela declaró a Duilio Martínez hijo legítimo de Luis Martínez. No vamos a intervenir con esa determinación judicial venezolana. No es necesario. Además, suponiendo que el derecho venezolano fuese contrario a las conclusiones a que hemos llegado, en este caso le daríamos preeminencia a nuestro derecho y no al extranjero por razón de que, en ese supuesto, dicho derecho extranjero estaría en abierta contradicción con la política pública (que es lo misma que orden público en este contexto) del pueblo de Puerto Rico. Dicha política pública, en lo aquí pertinente,

---

(⁷) Es de interés sobre este tema lo dicho en Calderón, *La Filiación en Puerto Rico,* 22 Rev. C. Abo. P.R. 251, 278 (1961), y en Arroyo, *La Igualdad en los Derechos Hereditarios,* misma revista y tomo, 41, 52.

está establecida en nuestra Constitución, la cual declara en su Art. II que "Todos los hombres son iguales ante la ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas" y en las Leyes Núms. 229 de 12 de mayo de 1942, 447 de 14 de mayo de 1947 y 17 de 20 de agosto de 1952. No sólo estaríamos ejerciendo nuestro derecho al así determinarlo, en el presente estado en que se encuentra el derecho internacional, sino que nuestro derecho postitivo así nos lo ordena, Art. 11 de nuestro Código Civil, 31 L.P.R.A. sec. 11, último párrafo.[8] Recuérdese además que los inmuebles relictos por el causante sitos en Puerto Rico se rigen por la ley de este país y también los muebles. Dice el Art. 10 del Código Civil "Los bienes muebles están sujetos a la ley de la nación del propietario; los bienes inmuebles, a las leyes del país en que están sitos." 31 L.P.R.A. sec. 10.

*Por las razones expuestas en esta opinión entendemos que no se cometieron los errores señalados y se confirmará la sentencia del Tribunal Superior, Sala de San Juan, declarando sin lugar la demanda, dictada en este caso en 18 de noviembre de 1958, excepto que se modificará para condenar a los demandantes al pago de las costas de los procedimientos en el Tribunal Superior y en este Tribunal, por ser mandatorias. Regla de Procedimiento Civil Núm. 44.4.*

---

[8] *Steele* v. *Bulova Watch Co.*, 344 U.S. 280, 286 (1952); *Donohue* v. *Donohue*, 236 N.Y.S.2d 890, 892 (1962); *International Fire Co.* v. *Kingston Tr. Co.*, 189 N.Y.S.2d 911, 913 (1959); *Levicky* v. *Levicky*, 140 A.2d 534, 536 (1958); *Fantony* v. *Fantony*, 122 A.2d 593, 597 (1956); Rabel, obra citada, 559; Taintor, obra citada, 881; Leflar, obra citada, sec. 48; Stumberg, *Cases on Conflict of Laws* (1956) pág. 91; Yanguas, *Derecho Internacional Privado* (Parte General), 2da. ed. (1958) pág. 293; Miaja, *Derecho Internacional Privado* (1955), Tomo II, pág. 280; Lorenzen, *The Enforcement of American Judgment Abroad*, 29 Yale L.J. 268, 279 (1920); Nussbaum, obra citada, 110; Graveson, obra citada, 485; Nussbaum, su artículo en *Selected Readings on Conflict of Laws* de la Association of American Law Schools, 1956, pág. 220.