HUNTER v. HUNTER et al.

No. 34232. March 18, 1952.

Rehearing Denied May 27, 1952.

Application for Leave to File Second Petition for Rehearing Denied June 10, 1952.

*244 P. 2d 1140.*

H. P. White and Paul A. Comstock, Pawhuska, for plaintiff in error.

L. R. Stith, Fairfax, for defendant in error.

JOHNSON, J. This is an appeal from the judgment of the district court of Osage county, Oklahoma, rendered on December 31, 1948, on an appeal from the county court determining the heirs of John Samuel Hunter, an Osage Indian Allottee, roll No. 383, deceased.

The record discloses that deceased left a will which was admitted to probate on November 18, 1941, from which no appeal was taken; that the bulk of deceased's estate was left to Francis Pearl Hunter, widow, Arthur Aaron Hunter and William Ballard Hunter, sons, and a cash bequest to Beatrice Hunter Red Eagle; that Joseph Hunter, plaintiff in error, filed a petition in the county court proceedings asking for a declaration of the heirs of the deceased claiming to be his son and heir, and to have been unintentionally omitted from the will and waived his right to contest the will and elected to take under the law of descent and distribution. From an adverse judgment, he appealed to the district court where the cause was tried de novo, which resulted in another judgment adverse to the claims of the petitioner, resulting in this appeal.

The trial court made findings of fact, the substance thereof material to the issues to be determined herein is: First, that there was no marriage between John Samuel Hunter, the alleged father of Joseph Hunter and Marie Osborne, the mother of Joseph Hunter, void or otherwise; second, that at no time did John Samuel Hunter take his alleged son, Joseph Hunter, into his home to live with him, with or without the consent of his wife, or acknowledge him in writing to be his son, or adopt him, or do anything to legitimate him in any manner known to the law, and that Joseph Hunter was neither the legitimate or legitimated son of John Samuel Hunter.

It is first contended by appellant that there was a common-law marriage between John Samuel Hunter and Marie Osborne, which was admittedly void because of living undivorced spouses

of the parties thereto, but that Joseph Hunter was the legitimate issue of the marriage and lawful heir of deceased, under 84 O. S. 1941 §215, which provides that the issue of all marriages null in law or dissolved by divorce are legitimate; and that the finding of fact to the contrary was against the clear weight of the evidence and contrary to law.

We shall first determine the question as to whether the court's finding that no such marriage existed was against the clear weight of the evidence.

Marie Osborne testified that she was a fullblood Cherokee Indian; that she graduated from the Normal school of the Cherokee Female Seminary of Tahlequah, Oklahoma, and was given a teacher's certificate, that she and John Osborne were married in 1912 and to this union three children were born; that they separated about 1921, but that neither obtained a divorce; that she was informed by Osborne's sister that he was dead; that in the spring of 1923, while she was living with Rosa West she first met John Hunter; that on the day she and he agreed to become husband and wife she, Josephine West and John Hunter left the West home in John Hunter's car; that when they had driven out into the pasture she and John got out of the car; that he took the back seat cushion out of the car and that they sat on it under the shade of a tree while Josephine drove the car on to Nelagony to get some cigarettes and a newspaper; that Josephine and Rosa West had already mentioned to her that John Hunter wanted to marry her; that while sitting there John made love to her; that she told him that she didn't want to just take up with him and he said it was done like that; that she knew about common-law marriages; that he asked her to marry him; that she consented and he and she agreed then and there to be husband and wife, whereupon they had sexual intercourse and lived together as man and wife until after Joseph Hunter was born; that she did not tell Dr. Meloy, who attended her at Joseph's birth, that John Osborne was the father of the child, but admitted signing a complaint in bastardy in the county court of Osage county against John Hunter in 1929; that shortly after her marriage Rosa West gave her and John Hunter a dinner and invited some others to celebrate their wedding or living together; that John, in the presence of others, acknowledged her as his wife; that she entered into the marriage in good faith; that John acknowledged Joseph as his son and continued to live with her on Rosa West's farm for a while after Joseph's birth.

The record discloses a birth certificate of a male child born to a fullblood Cherokee Indian woman whose maiden name was Marie Steiley, residence as Tahlequah, Oklahoma, age 33 years. The child's name is given as Osborne (Osbourne) and his father's name as John Osborne (Osbourne). This certificate was signed by Dr. R. C. Meloy, whose address is shown thereon as Claremore, Oklahoma.

Dr. R. C. Meloy testified that he resided in Claremore, Oklahoma; that he belonged to Rogers county, Oklahoma State and American Medical Associations; that he was a practicing physician and surgeon and was such on February 14, 1924, at Claremore, Oklahoma, and attended the birth of a child on that date at a place sometimes called the Reed Rooms and sometimes the Magnolia Rooms; that he was called by the landlady and by Tom Brown, a county commissioner, to go and attend Marie Osborne; that he answered the call; that he had never seen her before but saw her again when he testified in a bastardy case in 1930 in the county court; that he sought information for the child's birth certificate from Mrs. Osborne and sat down by the side of the bed and asked her the questions necessary to go in the birth certificate; that the information given to him was written in a book and then transferred to the birth certificate; that she told him that the father of the child was

her husband, John Osborne; that the child was legitimate and that she made no mention at that time that the baby belonged to John Hunter.

The record further discloses that in the bastardy proceedings, Marie Osborne and some of the witnesses for appellant in the case at bar testified therein and that no claim or mention was ever made, at that time, of any attempted common-law marriage but they now testfiy that there was such a relationship.

On December 3, 1929, the date of the first trial in the bastardy action, Marie Osborne testified that she was advised by John Hunter before she had sexual intercourse with him that he could not marry her because he had a wife from whom he was not divorced.

It is unquestioned that John (Samuel) Hunter, by license and statutory ceremony, was married in Osage county, Oklahoma, on June 29, 1921, to Louise Bacronrind Young and that this marital status continued until April 6, 1925, at which time Mrs. Hunter obtained a divorce in Osage county district court; that on April 8, 1925, John Hunter, two days after the divorce was granted, procured a marriage license and married Frances Reddick, a white person, at Winfield, Kansas, with whom he lived until his death on June 3, 1940.

The judgment of the court holding that there was no marriage between John Hunter and Marie Osborne, void or otherwise, is amply supported by the testimony and is not against the clear weight of the evidence.

However, appellant contends that the fact that John Hunter lived with Marie Osborne before and after Joseph Hunter was born was an acknowledgment that the child was his and constituted taking the child into his home and that the trial court misapplied §1 of Title 10 O. S. 1941, which provides that all children born in wedlock are presumed to be legitimate. We do not agree. This statute has no application to the facts herein.

Appellant and appellee each cite numerous authorities to sustain their respective contentions relative to the relationship shown to exist between John Hunter and Marie Osborne, but we consider only the case of Byington v. Wilhelm, 120 Okla. 190, 250 P. 1025, as of any material probatory value. The fact situation there was similar to the case at bar. In the body of the opinion, we said:

"Melissa Folsom, the mother of Mary Byington, was formerly Melissa Gibson, and was legally and lawfully married to one Morris Gibson. In 1911 or 1912, Melissa and Morris separated and Melissa went to live with Julius Byington, and after living with Julius about three years, a child was born to Melissa, the child being this plaintiff, Mary Byington. About nine or ten months before the child was born Morris Gibson, the lawful husband, visited Melissa. After the child was born in 1916, and after the birth of Mary, and while Melissa was still the lawful wife of Morris Gibson, Julius Byington died, seized of certain lands in Coal County, the lands being his homestead allotment, he being a fullblood Choctaw Indian. Sometime after the death of Julius, Melissa obtained a divorce from Morris Gibson.

". . .

"Plaintiff still insists that Mary Byington is the legitimate child of Julius Byington and Melissa Gibson; that this State recognizes common-law marriages; and that the presumption is in favor of the legitimacy as opposed to illegitimacy. While it is true common-law marriages have been recognized in this State under certain circumstances, it does not recognize either a common-law or ceremonial marriage where either of the parties is incompetent of contracting such a relation. Counsel cites the last sentence in Section 11303, C. O. S. 1921, where it is said:

" 'The issue of all marriages null in law, or dissolved by divorce, are legitimate.'

". . . This court, in Page v. Roddie et al., 92 Okla. 236, 218 P. 1092, discuss-

ing section 11303, supra, speaks in no uncertain terms when it says:

" 'The statute applies where the parties, in good faith, attempt to contract the marriage relation, against which some legal barrier exists, and not to a relation immorally entered into.'

"The relationship of Julius Byington and Melissa Gibson was not and could not be matrimonial, but was meretricious, and it is useless to discuss this phase of the situation at greater length. Plaintiff lays stress upon the contention that:

" 'The law presumes morality, and not immorality; marriage and no concubinage, legitimacy and not bastardy.' Citing Hynes v. McDermott, 91 N. Y. 451.

"We believe this is the universal rule in all civilized communities; certainly it is the rule in the State of Oklahoma, where this court has held in Locust v. Caruthers, 23 Okla. 373, 100 P. 520:

" 'In controversies involving heirship and legitimacy of children, the presumption of law is in favor of legitimacy, and the reason back of this presumption is that the law encourages decency and morality and right living.'

"This being the rule, if Mary Byington was bringing this action to be declared the heir of Morris Gibson and Melissa Gibson, lawful husband and wife, before the birth, at the time of the birth and for sometime after the birth of plaintiff, she would unquestionably be entitled to the benefit of this presumption, . . ."

Likewise, if Joseph Hunter (whose mother declared for the purpose of his birth certificate that his name was Osborne and that his father's name was John Osborne and that he was legitimate), was bringing this action to be declared the heir of John Osborne and Marie Osborne, his mother, who according to the evidence were lawful husband and wife, before the birth, at the time of the birth and at all times material thereafter, he would unquestionably be entitled to the benefit of this presumption.

Appellant further contends that the trial court misconstrued and misapplied §55, Title 10 O. S. 1941, which provides:

"The father of an illegitimate child by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of its birth. The status thus created is that of a child adopted by regular procedure of court."

Asserting that if Joseph Hunter were, in fact, an illegitimate child, that he had been legitimated by John Hunter, by acknowledging him as his own, receiving him as such into his family, and otherwise treating him as if he were legitimate, thus giving him the same status as if adopted by regular court procedure. Citing in support thereof Lawson v. Benson, 200 Okla. 235, 192 P. 2d 662; Jones v. Snyder, 121 Okla. 254, 249 P. 313; In re Buffington's Estate, 169 Okla. 487, 38 P. 2d 22; Blythe v. Ayres, 96 Cal. 532, 31 P. 915, 19 L. R. A. 40. These cases are authority for the rule that where a father of an illegitimate child publicly acknowledges it as his own, receiving it as such, with the consent of his wife, if he is married, into his family and otherwise treating it as if it were a legitimate child, he thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of its birth, and its status is that of a child adopted by regular procedure of the court.

But this rule for obvious reasons is not applicable to the case at bar because the paternity of the child was never acknowledged in writing or publicly, nor was the child accepted in deceased's home, with the consent of his wife.

While there is some evidence that he acknowledged to certain individuals that he was the father of the child,

yet he never did so publicly. Also, the appellant's mother, and others, gave evidence of such public acknowledgment, and acceptance into her home while deceased purportedly lived with her in the alleged common-law marital relationship, but such evidence, if true, was insufficient under section 55, O. S. A., Title 10, supra, and also this evidence, if material, was evidently discredited by the trial court because of their prior contradictory statements in the prior bastardy trials wherein the deceased was charged as being the father of appellant for the purpose of charging him with the responsibility of the child's support, but for which he was found not guilty.

We have carefully examined and weighed the evidence herein, and find the judgment of the trial court not to be against the clear weight thereof, nor contrary to law.

The judgment is affirmed.

HALLEY, V. C. J., and WELCH, CORN, GIBSON, and DAVISON, JJ., concur.