268 P.2d 236 (1954)
In re CRAVENS' ESTATE.
IRELAND
v.
CRAVENS et al.
No. 35880.
Supreme Court of Oklahoma.
March 16, 1954.
*237 Kelly Brown, Muskogee, for plaintiff in error.
G.O. Wallace, A.C. Kidd, Wewoka, Marvin Wooten, Konawa, for defendants in error.
CORN, Justice.
John S. Cravens died October 12, 1946, resident of Seminole county, Oklahoma. Proceedings were instituted in the county court for admission of a purported will to probate and letters of administration were issued to A.R. Cravens and R.C. Cravens. An appeal was taken to the district court from the order admitting the will to probate, where judgment was rendered reversing and setting aside the order of the probate court. An appeal was perfected to this court wherein we affirmed the judgment of the district court. See In re Cravens' Estate, 206 Okl. 174, 242 P.2d 135.
July 25, 1952, the administrators filed their final account and motion for distribution of the estate and discharge as administrators, whereupon plaintiff (Loretta Ireland) filed a petition for distribution, alleging her right to participate in the estate *238 as a daughter of the deceased. Other objections and exceptions to the administrators' final report were filed which need not be considered here. At the hearing plaintiff presented evidence in behalf of her petition for distribution. After consideration the probate court sustained defendants' demurrer to her evidence, denied any relief and dismissed the petition.
A lengthy record precludes extended recitation of the evidentiary matters relied upon to support plaintiff's claim that she was deceased's natural child and entitled to participate in his estate, by virtue of having been adopted publicly under the statutory requirements, 10 O.S. 1951 § 55 for adoption of illegitimate children; and, also by having been legitimated by written acknowledgment within the requirements of 84 O.S. 1951 § 215.
The substance of plaintiff's claim is that she was born near Chester, Arkansas, in 1894, and lived with her mother and grandfather (McCasslin) until her marriage in 1925 and establishment of a home in Van Buren, Arkansas. After that time deceased visited her frequently until the time of his death, carried on correspondence with her, assisted her financially to a small extent, persuaded her and members of her family to visit him at Konawa, and in such manner publicly acknowledged her as his child. A large number of letters purportedly written by deceased to plaintiff appear in evidence, as well as one letter, hereafter mentioned which, plaintiff contends, sufficiently fulfilled the requirements of a written acknowledgment of proof of parentage under the statute, supra.
Plaintiff's evidence reflects that after her birth she lived with her mother and grandfather, and when about 8 years of age learned her mother and father were not married. Her mother married and plaintiff lived with her mother until her own marriage. In 1925 deceased apparently learned of plaintiff's whereabouts and visited in her home, and other parties knew of his visit and that he was her father. On the occasion of his first visit deceased told her of his family and business interests, and offered her husband employment if they would move to Konawa. Plaintiff detailed several other visits deceased made in her home, and also testified concerning numerous letters purportedly received from deceased between 1925-1941. Most of these letters were very crudely typewritten and bore no written signature. She also testified to having received small gifts and small amounts of cash at various times. She further claimed deceased brought his son, Arthur, when he visited in 1926, but after that year made no other visits until 1937, for reason that her mother was living with her during that time. In 1937 he brought his grandson when he came to visit, and in 1938 returned with another grandson, and told plaintiff of his intention to bring all the boys to visit. Deceased returned to her home for a visit in 1943, and in 1947 she learned of his death. Between 1927-1937 deceased did not visit plaintiff, but it was claimed this lapse resulted from her mother living in plaintiff's home, although deceased continued to write to her and send small amounts of money.
On cross-examination plaintiff testified she was 31 years of age when she first saw deceased, never visited in his home in Seminole county, and did not know his wife (Martha) whom he had married in Chester, Arkansas, in 1894.
Two of plaintiff's witnesses testified to having met deceased when he visited plaintiff; that he was introduced as her father and stayed in plaintiff's home during his visits. Plaintiff's daughter remembered him visiting in the home, knew him as her grandfather, and recalled two different occasions when he brought one of his sons with him, and another occasion when he was accompanied by a grandson.
An elderly witness (Kimes) had known deceased during their early life in Arkansas and knew deceased's acquaintance with plaintiff's mother; that plaintiff's mother bore a child previous to marriage, and to his knowledge this child was the same person as Loretta Ireland, the plaintiff. Deceased had visited this witness in Fort Smith, Arkansas to inquire plaintiff's whereabouts, and on that occasion told Kimes he had accumulated some wealth and wanted to help his daughter. On one occasion when deceased visited the witness he was accompanied *239 by plaintiff. The witness knew plaintiff's reputation in the community where she was born as being deceased's child, and knew this to be true when deceased told him this.
The deposition of deceased's former son in law (Spinks) was received in evidence. He testified to having met deceased several times on the occasions of his visits to Arkansas. In October, 1941, the witness, accompanied by a brother in law, visited in deceased's home for two days, and had been there on previous occasions. The witness recalled the 1941 visit because he wanted to borrow some money from deceased. On that occasion deceased discussed plaintiff's parentage with witness, although no others were present, having just finished a letter to plaintiff which he then read to witness. He asked witness to address an envelope, and at that time added a pencilled postscript to this letter, and stated that since plaintiff was his daughter he intended to take care of her when he "passed on". The witness identified a letter as being one which he had addressed for deceased, and which they later went together to mail. He also testified deceased stated he had taken care of his other children and intended to take care of plaintiff, and intended to visit her again and tell her this.
The letter relied upon by plaintiff and constituting written acknowledgment of parentage was as follows:
".6.41
"konawa.okla
"Helo.Loretta.&.# Every body & every body else to just got your letter sat glad you are ok well iam still having trubble with my self i.have a.case of arthites giving me some trubble yet.guess i.will go back to clair more soon. i, aimed to come out thare soon but got cripled up. again dont no now when i, can come, am all right except my little minor ailments. may git all right pe prety soon, wee are having lots of rain here now, other wise every thing is okas far as i no, well yes old hittler is liable to come over and git us all by the top of the head now laugh at that, lots of pople scared to deth, a, bout foolshness well so much for that, well i, will rite a, gain when i, go to clair more, tell all the folks helo, and so long write a, gain soon and tell me all the news
"J S, Cravens to every one and all
"J S Cravens (in longhand)
"(In longhand)
"P S Well I will Come Down Some time after I Move do not no yet I will Bee a Way for a short time at Xmas But will Be Back Soon After hope you all hav a Good time Xmas So Rit me a Cashely to keep Posted yours with lott of love Dad
"J S Cravens"
The pencilled postscript, which the witness Spink testified he saw the deceased write, was written on a sheet of ordinary ruled paper. The tenor of this writing was that deceased would be away for a time at Christmas and would come to visit after he moved. The letter was signed J.S. Cravens, while the closing bore the word "Dad" immediately above the signature. Casual examination of this letter, which appears as defendants' Exhibit 4 in the record, discloses erasure on the purported letter where the word "Dad" appears.
The evidence in defendants' behalf was in direct conflict with the evidence relied upon by plaintiff as establishing the truth of her claim. Deceased's sons positively denied having seen plaintiff, or that she ever was in deceased's home. There was testimony from several witnesses that deceased was not living at his home in 1941, as testified by plaintiff's witness (Spink) but he had rented his farm and had moved to a home at his filling station in February, 1941, long prior to the time Spink claimed to have visited in the family home. There was other testimony directly contradictory to Spink's evidence relative to the physical surroundings of the deceased's home as testified to by such witness.
A banker (Dameron) and friend of long standing who was familiar with deceased's signature, identified his handwriting, and further testified that the signature upon the typewritten letter and pencilled postscript above mentioned were not written by deceased. Defendants also introduced in evidence *240 certain instruments bearing deceased's signature, together with additional testimony that the signature on plaintiff's Exhibit was not the same as the signature upon these instruments.
Deceased's oldest son, Arthur, denied ever having seen plaintiff in Fort Smith or Van Buren, Arkansas, or that she visited in his or his father's home. He further denied that he had a son bearing a nickname (Skeeter), as opposed to plaintiff's evidence such a named grandson had accompanied the deceased on one of the visits in plaintiff's home.
Seeking to reverse the trial court's order sustaining defendants' demurrer to the evidence and judgment dismissing the petition the plaintiff presents two propositions. Our statute, 10 O.S. 1951 § 55, provides as follows:
"The father of an illegitimate child by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of its birth. The status thus created is that of a child adopted by regular procedure of court."
Upon the basis of the statute it is plaintiff's argument that deceased's conduct constituted a public acknowledgment of plaintiff as his daughter. In support of such argument plaintiff relies upon that portion of the evidence which tends to establish paternity and, upon this basis then proceeds to the conclusion, drawn from other evidence introduced in plaintiff's behalf, that his entire course of conduct reflected his desire and intention to comply with the law.
Our recent decision in In re Gathings' Estate, 199 Okl. 460, 187 P.2d 981, is relied upon, together with earlier cases founded upon established precedent recognized in determination of questions of this nature. Our holding in the Miller case, supra, requires strict proof of the fact of parentage, but then announces that other considerations enumerated in the statute, affecting legitimation are to be liberally construed.
Relying upon these principles plaintiff points out the evidence establishing parentage, and thereafter insists upon the following circumstances as establishing deceased's public acknowledgment of her as his daughter. Upon learning the whereabouts of plaintiff deceased wrote to her and thereafter visited in her home and was introduced as her father. By correspondence, visitation and some financial assistance he further chose to treat her as a legitimate child. Since plaintiff maintained a home of her own it was impossible to take her into his own family, so deceased satisfied this statutory requirement by inviting plaintiff's family to visit him, and by taking members of his family to visit plaintiff. Even accepting as true the evidence relied upon as establishing these matters, the question remains whether such acts constituted compliance with the requirements of the statute.
We are of the opinion the various acts relied upon did not accomplish the requisite acknowledgment. The reasons for so holding are obvious. Deceased was married and maintained a home. Even though of mature years and maintaining her own home, there was nothing to have prevented deceased taking plaintiff into his own community and there publicly acknowledging the relationship had he so desired. It is most noticeable that, following the claimed reunion with her father, at no time over the ensuing 18 years did the deceased see fit to put forth any measurable effort to effect recognition of plaintiff as his daughter in his home community.
Most recently we have considered a similar question in In re Lewis' Estate, 200 Okl. 352, 194 P.2d 174, and Hunter v. Hunter, 206 Okl. 573, 244 P.2d 1140. The latter case presents an able discussion of the elements required to bring such cases within purview of the statute. Without consideration of the matter from the standpoint that the acts of decedent relied upon by plaintiff took place in another state, we are of the opinion plaintiff's evidence wholly failed to establish deceased's public acknowledgment, *241 there being no attempt to acknowledge her to his family or receive her therein as a member thereof. See In re Cook's Estate, 63 Ariz. 78, 159 P.2d 797, which holding is based upon a statute identical with our own, and wherein appear matters of factual similarity to the present case.
We conceive the intent of the statute to be, (as respects legitimation of an illegitimate child,) that legitimation may be accomplished by a parent only by an open and notorious recognition of paternity and a general holding out to such parent's own family of the fact of parentage, coupled with such conduct as to make it plain to those who know him that there is a clear-cut intention the illegitimate child's civil and social status shall thereafter be that of a lawful child of the natural father. The policy of the law is to favor the legitimation of children born out of wedlock. In re Chew's Estate, 200 Okl. 317, 193 P.2d 572. The laws of the father's domicile at the time he acts determine the effect thereof. Pfeifer v. Wright, 10 Cir., 41 F.2d 464, 73 A.L.R. 932. But, the acts relied upon must be sufficient to discharge the burden of proof upon the elements enumerated in Hunter v. Hunter, supra, and Thompson v. Thompson, 177 Okl. 437, 60 P.2d 615. The matters herein relied upon cannot be said to meet the test.
The second contention is that plaintiff was properly legitimated within the requirements of 84 O.S. 1951 § 215, which provides as follows:
"Every illegitimate child is an heir of the person who in writing, signed in the presence of a competent witness, acknowledges himself to be the father of such child; and in all cases is an heir of his mother; * * *."
The basis of this claim is that the letter heretofore quoted, to which deceased purportedly pencilled a postscript and signed in the presence of the witness (Spinks) and for which he requested Spinks to address an envelope, constituted a sufficient acknowledgment in writing of deceased's paternity to permit plaintiff to participate in his estate as though born in lawful wedlock. In this connection plaintiff urges that this instrument should be considered in conjunction with the other letters, some bearing the salutation "daughter" and others signed "dad". Since, however, the statute is clear upon this point, it is apparent that plaintiff's claim must stand or fall upon the one letter alone, no claim being advanced that any of the other communications fall within the terms of the statute, supra.
In this jurisdiction the rule always has been that the statute does not require any particular formality of the written acknowledgment. Holloway v. McCormick, 41 Okl. 1, 136 P. 111, 50 L.R.A., N.S., 536; Barber v. Barber, 198 Okl. 520, 180 P.2d 658. Our attention has been directed to our decisions in Burns v. Lawson, Adm'r, 188 Okl. 181, 107 P.2d 555, and Doty v. Vensel, 190 Okl. 461, 124 P.2d 982.
Even accepting the plaintiff's version concerning execution of the letter in question, we are of the opinion the letter wholly fails to meet the requirements of the statute under our decisions. Under the decisions cited above a writing (relied upon as acknowledging paternity) must be signed in the presence of a competent witness, and paternity must directly and unequivocally be acknowledged therein. Under the test laid down in the McCormick case, supra, it is impossible to take this writing by its four corners and conclude that it directly, unequivocally and unquestionably acknowledges deceased's paternity of this plaintiff.
This court, on an appeal from district court in a trial de novo from the probate court, will not disturb the findings and judgment of the trial court unless same are clearly against the weight of the evidence. Thompson v. Thompson, supra, and cases therein cited.
Judgment affirmed.
HALLEY, C.J., JOHNSON, V.C.J., and WELCH, DAVISON, O'NEAL, WILLIAMS and BLACKBIRD, JJ., concur.