JUANA MARTÍNEZ ET AL., Plaintiffs and Appellants, v. ANTONIA PÉREZ WIDOW OF MARTÍNEZ ET AL., Defendants and Appellees.

No. 93. Decided May 24, 1963.

430

*Celestino Iriarte, H. González Blanes,* and *F. Fernández Cuyar* for appellants. *Rodolfo F. Aponte* for Antonia Pérez widow of Martínez. *Canales & Segarra* and *José F. Quetglas Álvarez* for Duilio Martínez.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE RIGAU delivered the opinion of the Court.

The principal characters and their roles in this case are Luis Martínez, the predecessor in interest, a Puerto Rican and father; Mercedes Vázquez, a Venezuelan and mother; and Duilio Martínez, the son of the afore-named Luis and Mercedes.

César Núñez, at that time aged 21, and Mercedes Vázquez, aged 14, both Venezuelans, contracted marriage in Caracas in February 1939. Mercedes' mother appeared at the wedding in order to give her consent formally since the contracting party was a minor. A few months after they were married "I left the house," said Núñez,[1] and went to live in Peru in September 1939, and did not return to Venezuela until seven years later, in 1947. Mercedes remained in Caracas with her mother. The young spouses did not have any children.

On October 15, 1943 Mercedes filed an action of divorce in Caracas on the ground of abandonment. The court designated Mercedes' mother as her guardian since the former was a minor, and issued pertinent orders for summoning the parties. We have no further information on this proceeding.

Mercedes Vázquez and the predecessor in interest, Luis Martínez, had sexual intercourse of which a child was born in Caracas on June 6, 1944. The minor was registered that

---

[1] In his action of unknown paternity to which we shall presently make reference.

year in the Civil Register of Births in Caracas as the illegitimate son of Mercedes Vázquez, single, aged 20. It appears from the record that the predecessor did not abandon his son, but, on the contrary, he cared for him with the solicitude of a good father, and lastly, while the child was still of tender years, he brought him to the home which he established later in Puerto Rico with his Puerto Rican wife, where the minor remained in the care of the widow upon Martínez' death.

In 1946 the predecessor, while still living in Caracas, filed a legitimation proceeding before the Supreme Court of the Federal District in Caracas "for the purpose of legitimizing my minor illegitimate son Duilio Vázquez, whom I acknowledge as such." The child's mother appeared in the proceeding for the purpose of giving her consent "in order that my named minor son be legitimized by his natural father, Luis Martínez." Martínez had been married to Modesta Ortiz, who had died in Venezuela in April 1945. On October 4, 1946 the Venezuelan court, after proper proceedings were had, decreed "the legitimation sought, wherefore minor Duilio Martínez (formerly Vázquez) acquired the juridical status of legitimate son of Luis Martínez."

The predecessor in interest executed a closed will in Caracas on January 19, 1953 designating as heirs his son Duilio Martínez, his sister Providencia Martínez, his nephew Pedro Matos, and his wife Antonia Pérez. The genuineness of the will is not in question (Exh. III of both parties). Corroborating the foregoing in regard to the father's request concerning his son, let us see what the deceased said, in part, in his will:

"My legitimate heir is my minor son Duilio Martínez, who was registered in the Civil Record of Santa Rosa Parish under the name of Duilio Vázquez but who was subsequently legitimized by me, after complying with the legal requirements, pursuant to a decree of the Supreme Court of the Federal District. I own at present property in the Republic of Venezuela and in Puerto Rico, and it is my first disposition that the share of the

legal portion which may correspond to my said child under the respective laws of those countries be respected.

". . . Since my minor son Duilio, who lives with me, is of tender years, and in the event that the future administration of the property which may correspond to him may jeopardize or endanger his interests, I urge my designated heirs and my friends, Dr. Domingo Antonio Coromil and Mariano Rivero F., to lend their assistance in such a way as will conserve the minor's property in order that he may receive it upon attaining majority and that the interest or rent therefrom may be used in his education and support."

Martínez died in San Juan, Puerto Rico, on December 27, 1954 under the aforesaid will while he was married to Antonia Pérez de Martínez. The spouses had their residence in Villa Caparra, Guaynabo, Puerto Rico, and Duilio, who at his father's death was 10 years old, lived with them since they were married.

Martina Martínez, the predecessor's mother, died in 1955 and in September of that year the plaintiffs, four uncles and one cousin of Duilio (four sons and a grandchild of Martina), filed in San Juan an action of nullity of designation of heirs and other particulars claiming Luis Martínez' inheritance for them.

In view of the fact that plaintiffs attributed Duilio's paternity to César Núñez, on January 29, 1957 Núñez filed in Caracas an action of disclaim of paternity alleging in part as follows:

"I hardly lived one year with my wife, and owing to the serious difficulties frequently existing between us, I left the house before we had lived together one year and since then I did not have any kind of natural contact with my said wife. However, during the short duration of the marriage, my wife and I did not bear any children and after I left the home I never had any contact with my wife, neither material nor moral nor of any other kind. Owing to such circumstance, I have been shocked to learn that the paternity of an illegitimate child of my wife, named Duilio, is attributed to me." (Exh. IV of both parties.)

On June 4, 1957 the Venezuelan court sustained said action of unknown paternity brought by Núñez and, consequently, it held that minor Duilio Martínez is not the legitimate son of César Núñez. (Exhibit IV.)

Briefly, plaintiffs alleged the following in their complaint: (a) That Luis Martínez did not leave descendants of any kind; that his only ascendant was his mother Martina Martínez, who died in 1955 leaving as sole and universal heirs her children and one grandchild, namely, the plaintiffs.

(b) That the designation of heirs contained in Luis Martínez' will is null and void since he omitted as his heir his mother Martina Martínez; because it was false that minor Duilio was the son of said predecessor; because the minor's acknowledgment made by Luis Martínez pursuant to the laws of Venezuela is null and void because it was made without the consent of the minor's legitimate father; and because at the time of conception, birth and acknowledgment of said minor his legitimate parents were married.

The Superior Court first rendered judgment sustaining the complaint and defendants filed extensively argued motions for reconsideration. After a careful study of the allegations and briefs of the parties, the court, as it explains, concluded that its former judgment should be set aside and it did so by judgment of November 18, 1959 and dismissed the complaint.

Plaintiffs contend that the trial court erred (1) in ruling that the predecessor was domiciled in Puerto Rico; (2) in failing to conclude that the minor's domicile was Venezuela; and (3) in failing to conclude that the minor's acknowledgment by the predecessor is nonexistent and, consequently, that the minor's domicile is Venezuela and the laws of that country determine his status.

Plaintiffs' allegations (a) that Luis Martínez did not leave descendants of any kind, and (b) that it is false that minor Duilio was his son, are indeed frivolous. The issue

involved herein actually consists in determining the minor's status, since once it is determined we can conclude whether or not he is heir, and if he is, what kind of heir he is.

 The predecessor's original domicile was Puerto Rico. He was born here; he married a Puerto Rican here for the first time. He lived and did business in Puerto Rico and Venezuela. He became a widower while he was in Venezuela. After his child was born he executed a will in Venezuela. (Of course, executing a will in Venezuela does not change by itself his domicile. One does not execute a will to change domicile but as a provident measure, and this perhaps is especially so if one is away from his domicile.) Martínez then returned to Puerto Rico where again he married a Puerto Rican and brought his son to live with them and remained here until his death. The fact that the predecessor signed some documents in Venezuela setting forth that he is domiciled in Venezuela does not convince us, nor did it convince the trial court, that his intention was to change his domicile. The meaning of that phrase in those documents is rather that he was residing in Venezuela. As is known, one may have more than one residence but only one domicile, *Fiddler* v. *Secretary of the Treasury*, 85 P.R.R. 302 (1962). Domicile can be changed only by the union of act and intent, § 11 of the Political Code, 1 L.P.R.A. § 8; *González* v. *Santiago*, 84 P.R.R. 366 (1962); *González* v. *Secretary of the Treasury*, 76 P.R.R. 128, 133 (1954); *Enjuto* v. *District Court*, 49 P.R.R. 358, 362 (1936); Restatement, Conflict of Laws, Draft No. 2, § 15 (1954). The intention must be an intention to make a home in fact, Restatement, *supra* § 19. See, also, Leflar, The Law of Conflict of Laws 15 (1959); Graveson, The Conflict of Laws 78 (1955); Stumberg, Conflict of Laws 20 (1951); Goodrich, Conflict of Laws 50 (3d ed. 1949). There is no evidence that the predecessor's intention was to change his original domicile and to make his residence abroad a new domicile. The evidence shows otherwise,

which is the trial court's conclusion. The first error assigned was not committed.

Let us consider next the last two errors assigned as to which is the minor's domicile and which is the applicable law. They are so closely interrelated that we will discuss them jointly. There is no question that the predecessor acknowledged his son Duilio. First, in 1946, he instituted successfully a judicial proceeding to acknowledge his child. Plaintiffs challenge the validity of the judgment of the Venezuelan court to that effect. We need not discuss that point since it is not controlling whether or not there was a valid judgment. The controlling factor is whether an acknowledgment was made. It is clear that the predecessor acknowledged his child in that public and official proceeding. We held something similar as to the principle, although not as to the facts, in *Iturrino* v. *Iturrino*, 24 P.R.R. 439, 443 (1916).[2] Second, even if we overlook the aforementioned acknowledgment, we still have the uncontroverted fact that the predecessor acknowledged his child in an undubitable will. The will is tantamount to the voluntary acknowledgment of a child, *Cortés* v. *Cortés*, 73 P.R.R. 643, 652 (1952). For greater clarity and in order to overcome the presumption of paternity on the part of the putative father, César Núñez, it must be recalled that he brought a judicial action denying the minor's paternity which was successful. Moreover, the facts point to the inescapable truth of Núñez' position: he left for Peru in 1939; the minor's mother remained in Venezuela; they had no further contact of any kind; the minor was born in 1944; Núñez returned to Venezuela in 1947.

■ Since the question concerns a parent who acknowledges his child, the status of the child is determined by the

---

[2] See Restatement, Second, Conflict of Laws, § 140, comment (c): "The place where the legitimating act takes place is unimportant. It is only necessary that the effect of this act is to legitimate the child under the law of the state of the domicil of the parent concerned."

law of the domicile of his parent, *Howells* v. *Limbeck*, 175 N.E.2d 517 (1961); *In re Craven's Estate*, 268 P.2d 236 (1954); *In re Stater's Estate*, 90 N.Y.S.2d 546 (1949); Annotation in 87 A.L.R.2d 1274, 1296, § 12. In the oft-cited case of *Blythe* v. *Ayres*, 31 Pac. 915 (1892), the minor was domiciled in England. The father, who was domiciled in California, acknowledged her. The Supreme Court of California adjudged her legitimated under California law, although such thing would not have been possible under English law. In *Moen* v. *Moen*, 92 N.W. 13 (1902), another oft-cited case in the literature on the matter, Moen, who was domiciled in Norway, acknowledged his daughter in writing. The Norwegian law would not permit him to do so, but the South Dakota court (U.S.) ruled that Moen's act showed that the child was his daughter and that she therefore inherited the real property which Moen had left in South Dakota. The orthodox, universal or quasi-universal tendency is in the afore-stated sense: the legitimacy of the acknowledged child is determined by the law of the domicile of the legitimating father. See Restatement of the Law, Second, Conflict of Laws, §§ 137, 138 and 140; Restatement, Conflict, § 137; Ehrenzweig, Conflict of Laws 394 (West Publishing Co., 1962); Leflar, *op. cit.* at 344; Stumberg, *op. cit.* at 330; Cheshire, Private International Law 407 (5th ed. 1957); Graveson, *op. cit.* at 152; Rabel, *op. cit.* at 630; Goodrich, *op. cit.* at 434; II Beale, The Conflict of Laws 711 (1935); comments in 13 W. Res. L. Rev. 446 (1961).[3]

---

[3] For other works on the matter, see Ester, *Illegitimate Children and Conflict of Laws*, 36 Ind. L.J. 163 (1961); Baxter, *Recognition of Status in Family Law*, 39 Can. B. Rev. 301 (1961); Lasok, *Legitimation, Recognition and Affiliation Proceedings*, 10 Int'l & Comp. L.Q. 123 (1961); Guttman, *Whither Legitimacy: An Investigation of the Choice of Law Rules to Determine the Status of Legitimacy*, 14 Rutgers L. Rev. 764 (1960); Guttman, *The Status of Legitimacy in Comparative Conflict of Laws*, 8 Int'l & Comp. L.Q. 678 (1959); Mann, *Legitimacy and the Conflict of Laws*, Notes in 64 L.Q. Rev. 199 (1948); Welsh, *Legitimacy in the Conflict of Laws*, 63 L.Q. Rev. 65 (1947); Mann, *Legitimation and Adop-*

We are faced with a situation in which either of the two great juridical traditions which we may apply—the continental European civil law or the Anglo-Saxon common law—would work the same result: the law of Puerto Rico would be applied. As is known, in order to determine in a situation such as this which is the applicable personal statute, the civil tradition follows the nationality doctrine and the common law maintains the domicile doctrine.

██ At present a majority of the countries follow the nationality principle and it has been so followed by the Hague Conference on Private International Law. The nationality theory seems more complete from the theoretical point of view, but the domicile theory is more practical, and for those countries which in one way or the other form a part of a federal system, the domicile theory seems the most proper. This is so because, although for international purposes the citizens of a federation have a federal citizenship, for internal purposes and for purposes related to juridical areas in which there is no applicable federal legislation, they have the local or state citizenship. This duality of citizenship, inherent in the federal systems, made it necessary for those systems to adopt the territorial or domicile theory. For example, in the case at bar, although Martínez was a citizen of the United States of America federation, there is no federal statute on family relations, but the law of the state, in this case the law of Puerto Rico, is applied. Owing to that duality of jurisdiction which contains within itself the federal systems, the latter follow the domicile doctrine. For a complete summary of this situation, see Reed, *Domicile and Nationality in Comparative Conflict of Laws*, 23 U. Pitt. L. Rev. 979 (1962).

---

tion in *Private International Law*, 57 L.Q. Rev. 112 (1941); Stumberg, *The Status of Children in the Conflict of Laws*, 8 U. Chi. L. Rev. 42 (1940); Taintor, *Legitimation, Legitimacy and Recognition in the Conflict of Laws*, 18 Can. B. Rev. 589 (1940), and in Selected Readings on Conflict of Laws, at 843.

See, also, on the matter, Gallardo, *La Ley del Domicilio: Punto de Conexión Admirable en el Derecho Internacional Privado Latinoamericano,* 2 Inter-American L. Rev. 15 (1960) ;[4] I Rabel, The Conflict of Laws, Chs. 4 and 5 (1945) ; Goodrich, Conflict of Laws (3d ed. 1949) ; and the works appearing in Ch. I of the excellent collection, Selected Readings on Conflict of Laws, edited by the Association of American Law Schools, 1956.

▪ As we stated, in the case at bar either of the two traditions, the civil or the common law, would produce the same result since, if we follow the civil tradition (nationality doctrine), Martínez' personal statute would be the legislation of Puerto Rico, and if we follow the common law (the domicile doctrine), the law of Puerto Rico is also the applicable law. Of course, in our jurisdiction the domicile is determinative of the personal statute, *Lókpez* v. *Sotelo,* 70 P.R.R. 475, 480 (1949) ; *Lókpez* v. *Fernández,* 61 P.R.R. 503, 512 (1943), and since the decedent's domicile was Puerto Rico, the status of minor Duilio Martínez is determined by the law of Puerto Rico.

▪ There still remains to apply the law of Puerto Rico to the case. The well-established principles in Puerto Rico are that the hereditary rights of persons are regulated by the legislation in force at the time of the predecessor's death,[5] and that the filiation status is governed by the law in force at the time of the birth of the person whose status is in question.[6]

---

[4] The English text of that article appears also in the same review.

[5] *Ab Intestato of Ana Garroti Padilla,* 79 P.R.R. 180, 181 (1956); *Silva* v. *John Doe,* 75 P.R.R. 198, 204 (1953) ; *Cancel* v. *Martínez,* 74 P.R.R. 100, 106 (1952) ; *Travieso* v. *Del Toro,* 74 P.R.R. 940, 944 (1953) ; *Febre* v. *Febre,* 40 P.R.R. 208, 213 (1929) ; *Ex parte Smith,* 14 P.R.R. 643, 651 (1908).

[6] *Sánchez* v. *Díaz,* 78 P.R.R. 771, 776 (1955) ; *Silva* v. *John Doe,* 75 P.R.R. 198, 207 (1953) ; *Torres* v. *Heirs of Cautiño,* 70 P.R.R. 614, 620

Minor Duilio was born in 1944 while Act No. 229 of May 12, 1942, laws of that year, p. 1296, 31 L.P.R.A. § 501, was in force, which provided in § 1 that "All children born out of wedlock subsequent to the date this Act takes effect, *shall be natural children*, whether or not the parents could have married at the moment when such children were conceived." (Italics ours.) These children, Act No. 229 *supra* further adds in § 1, will be legitimized by the subsequent marriage of the parents to each other. Duilio, as already seen, was voluntarily legitimized by his father.

■ The predecessor died in 1954 when Act No. 447 of May 14, 1947, laws of that year, p. 944, 31 L.P.R.A. § 2362, was already in force, which excluded, in a testate succession, the hereditary rights of the legitimate parents when there are legally recognized natural children, *Ex parte Orona*, 87 P.R.R. 800 (1963) ; *Travieso* v. *Del Toro*, 74 P.R.R. 940, 944 (1953) ; *Sánchez* v. *District Court*, 69 P.R.R. 457, 461 (1949). Under Act No. 447 of 1947 and the provisions of Act No. 229 of 1942, minor Duilio is the forced and universal heir of his father.[7]

■ The Venezuelan court adjudged Duilio Martínez the legitimate child of Luis Martínez. We will not interfere with that Venezuelan judicial determination. It is not necessary. Furthermore, assuming that the Venezuelan law were contrary to the conclusions which we have reached, in this case we would accord preference to our law and not to the foreign law since, in that assumption, such foreign law would be in open conflict with the public policy (which is

---

(1949) ; *Toro* v. *Ríos*, 68 P.R.R. 704, 705 (1948); *Mercado* v. *Heirs of Mangual*, 35 P.R.R. 388 (1926) ; *Morales* v. *Heirs of Cerame*, 30 P.R.R. 784 (1922) ; *Méndez* v. *Martínez*, 21 P.R.R. 238, 252 (1914) ; *Charres* v. *Arroyo*, 16 P.R.R. 777, 781 (1910).

[7] What is said in Calderón, *La Filiación en Puerto Rico*, 22 *Rev. C. Abo. P.R.* 251, 278 (1961), and in Arroyo, *La Igualdad en los Derechos Hereditarios, op. cit. supra* at 41, 52, is of interest on this matter.

the same as the public policy in this context) of the people of Puerto Rico. Such public policy, so far as pertinent herein, is established in our Constitution which declares in Art. II thereof that "All men are equal before the law. No discrimination shall be made on account of race, color, sex, birth, social origin or condition, or political or religious ideas," and in Acts Nos. 229 of May 12, 1942, 447 of May 14, 1947 and 17 of August 20, 1952. Not only would we be exercising our right to so determine, in the present state of international law, but it is so provided by our positive law, § 11 of our Civil Code, 31 L.P.R.A. § 11, last paragraph.[8] It should be further recalled that the real as well as the personal property left by the predecessor, situated in Puerto Rico, is governed by the law of this country. Section 10 of the Civil Code provides "Personal property is subject to the laws of the nation of the owner thereof; real property to the laws of the country in which it is situated." 31 L.P.R.A. § 10.

For the reasons stated in this opinion, we believe that the errors assigned were not committed, and the judgment of the Superior Court, San Juan Part, dismissing the complaint, rendered in this case on November 18, 1958, will be affirmed, except that it will be modified ordering plaintiffs to pay the costs of the proceedings in the Superior Court and in this Court which are compulsory. Rule 44.4 of the Rules of Civil Procedure.

---

[8] *Steele* v. *Bulova Watch Co.*, 344 U.S. 280, 286 (1952); *Donohue* v. *Donohue*, 236 N.Y.S.2d 890, 892 (1962); *International Fire Co.* v. *Kingston Tr. Co.*, 189 N.Y.S.2d 911, 913 (1959); *Levicky* v. *Levicky*, 140 A.2d 534, 536 (1958); *Fantony* v. *Fantony*, 122 A.2d 593, 597 (1956); Rabel, *op. cit.* at 559; Taintor, *op. cit.* at 881; Leflar, *op. cit.*, § 48; Stumberg, Cases on Conflict of Laws 91 (1956); Yanguas, *Derecho Internacional Privado (Parte General)* 293 (2d ed. 1958); II Miaja, *Derecho Internacional Privado* 280 (1955); Lorenzen, *The Enforcement of American Judgment Abroad*, 29 Yale L.J. 268, 279 (1920); Nussbaum, *op. cit.* at 110; Graveson, *op. cit.* at 485; Nussbaum, his article in Selected Readings on Conflict of Laws, Association of American Law Schools, 1956, p. 220.