2004 OK CIV APP 34

**In the Matter of the ESTATE OF Hettie C. GENTRY and Joe Braddock Gentry, Deceased.**

**Inez L. Murphy, Petitioner/Appellant,**

v.

**Rocky Gentry, Appellee.**

No. 98,720.

Court of Civil Appeals of Oklahoma, Division No. 3.

Jan. 23, 2004.

Certiorari Denied April 5, 2004.

G. Dale Elsener, Elsener & Cadenhead, P.C., Seminole, OK, and John R. Hargrave, Scott R. Farris, Edmonds, Cole, Hargrave, Givens Witzke, Ryan & Woodson, Oklahoma City, OK, for Petitioner/Appellant.

Jack Mattingly, Jr., the Mattingly Law Firm, P.C., Seminole, OK, for Appellee.

Opinion by BAY MITCHELL, Presiding Judge.

¶1 Inez L. Murphy (Murphy) filed a petition to probate the will of her mother, Hettie C. Gentry (Hettie), and to issue letters of administration for the estate of her brother, Joe Braddock Gentry (J.B.), who had died intestate. Murphy and J.B. were the sole surviving beneficiaries under Hettie's will, and Murphy alleged that she was J.B.'s sole heir and thus entitled to both of these estates. However, Rocky Gentry (Rocky) and four of his siblings filed an answer claiming to be J.B.'s children and alleging a superior right of inheritance as J.B.'s children.

¶2 Rocky's legitimacy was challenged, motions were filed and a hearing was held. The court entered an interlocutory order appointing Murphy as the personal representative of Hettie's estate and dismissed her petition for Letters of Administration for the estate of her brother, J.B. The court also determined Rocky to be the son and legitimate heir of J.B. Murphy appeals this interlocutory order.[1] Probate proceedings are of equitable cognizance and the trial court's findings and decree will not be disturbed unless found to be clearly against the weight of the evidence or contrary to law. *Matter of Bartlett*, 1984 OK 9, 680 P.2d 369, 374.

¶3 J.B. Gentry died intestate in November of 2001 with one surviving sister and five people who claimed to be his children. The questions of who had the right to inherit J.B.'s estate and who had the right to request letters of administration are governed

---

1. Rocky's four siblings are not parties to this appeal.

by 84 O.S.2001 § 213(B)(2) (descent and distribution), and 58 O.S.2001 § 122 (letters of administration), which both give superior rights to surviving children to the exclusion of surviving siblings. However, illegitimate children cannot inherit intestate unless they have been legitimized. *Matter of Johnson's Estate*, 1977 OK 30, ¶ 8, 560 P.2d 962, 964. Here, the evidence was undisputed that Rocky was illegitimate, so the sole question on appeal is whether the paternity affidavit was sufficient to legitimize Rocky as a matter of law.

¶ 4 In 1964, 84 O.S.1961 § 215 provided one way to legitimize a child for inheritance purposes:[2]

> Every illegitimate child is an heir of the person who in writing, signed in the presence of a competent witness, acknowledges himself to be the father of such child . . .

This statute does not require any particular formality for the written statement, but the acknowledgment of paternity must be clear and unequivocal. *In re Cravens' Estate*, 1954 OK 82, ¶ 24, 268 P.2d 236, 241. The burden of proving legitimacy is on the claimant. *Estate of Johnson*, 1977 OK 30, ¶ 16, 560 P.2d 962, 965.

¶ 5 The evidence was undisputed that Rocky was born on March 19, 1960 to Flora Williams, and that J.B. had sexual relations with Flora during the relevant time frame. Rocky submitted certified copies of his Certificate of Live Birth, an Amendment to Birth Certificate and a Paternity Affidavit. Rocky's original birth certificate listed his last name as Williams and did not list any information for his birth father. However, the birth certificate was amended by the Oklahoma State Department of Health on June 12, 1964 based on a Paternity Affidavit signed by J.B. Gentry on April 30, 1964 and by Flora Williams on June 10, 1964. This Amendment changed his name to Rocky Gentry, listed Joe B. Gentry as his father and contained a Certification that the supporting documents had been examined and appeared authentic.

¶ 6 The Paternity Affidavit provided: "Before me, the undersigned Notary Public, personally appeared J.B. Gentry of Wewoka, Oklahoma who being duly sworn deposes and says that he is the father of the child born to Flora Williams on 3–19–60 in Wewoka, Oklahoma, and that the child's correct name should be Rocky Gentry." The Affidavit was signed by "J.B. Gentry" and properly notarized. In addition, the Paternity Affidavit also contained a signed and notarized statement by Flora Williams acknowledging that J.B. was Rocky's father and requesting that Rocky's birth certificate be amended.

¶ 7 This Paternity Affidavit satisfied the requirements of 84 O.S.1961 § 215. The Affidavit is a writing signed by J.B. in the presence of a notary, in which he unequivocally acknowledged that Rocky was his child. Murphy argued that Rocky did not produce any evidence that J.B. signed before a competent witness. However, J.B.'s signature was witnessed by a notary public, who was not only a witness to the signature, but also provided verification that his signature was authentic. *See* 49 O.S.2001 § 113 (requiring notary public to verify that the person appearing before her is the one signing the document). The fact that this Affidavit was notarized distinguishes it from the written acknowledgment that was insufficient to support summary judgment in *Hulett*, 1998 OK 21, ¶ 26, 956 P.2d at 886–87, where there was no evidence that the father's signature had been witnessed.

¶ 8 At this point, the burden shifts to Murphy to present admissible evidence showing that there was a genuine issue of material fact regarding J.B.'s written acknowledgment. Murphy raised four main objections: 1) there was no evidence that the documents were authentic; 2) there was evidence that J.B. had denied having children

**2.** The parties referred to the current enactment of section 215 and other recently enacted statutes to determine the effect of the paternity affidavit. However, the relevant statutes are the ones in effect at the time J.B. executed the affidavit. This Court will not consider the effect of subsequently enacted statutes such as 10 O.S.2001 § 70 (providing that a notarized statement of paternity signed by the mother and father has the same effect as a judicial determination of paternity) or the Oklahoma Guardianship and Conservatorship Act, 30 O.S.2001 § 1–101, *et. seq.* (supplying definitions for incapacitated persons and guardianship powers).

and was sterile; 3) there was no separate evidence of paternity presented; and 4) there was evidence that J.B. was not competent to sign the Paternity Affidavit.

█ ¶ 9 First, Murphy attacked the validity of Rocky's documents because the Birth Certificate was "inexplicably amended" four years after Rocky's birth, and the Paternity Affidavit had the typed birth date for Rocky marked out with the correct birth date handwritten above it. However, the documents clearly show that Rocky's Birth Certificate was amended based on the Paternity Affidavit, and do not disclose any irregularity. In addition, these documents were properly certified by the State Registrar of Vital Statistics and the Affidavit was notarized. A document properly notarized "imports verity" that can only be overcome by clear and convincing evidence. *Southard v. MacDonald,* 1961 OK 72, ¶ 32, 360 P.2d 940, 945. Mere allegations by Murphy that she did not believe the documents were authentic are insufficient to create a genuine issue of material fact on this issue.

¶ 10 Second, Murphy argued there was a genuine issue of material fact because she presented evidence that J.B. had denied having any children and because he was sterile. Murphy and her daughter both testified in their depositions that J.B. was sterile, but the only evidence to support their allegations were statements made to them by Hettie Gentry that J.B.'s doctor had informed her J.B. was sterile due to having the mumps in high school. This testimony was inadmissible double hearsay, and Murphy did not present any exception to the general rule that hearsay evidence is inadmissible. 12 O.S. Supp.2002 § 2802. In addition, Murphy did not produce any medical records or other admissible evidence that would support her assertion that J.B. was sterile. Murphy did not know if J.B. had ever had a sperm count or other test to show he was sterile. Murphy also testified that J.B. told her several times he did not have any children, with the last time being before her mother died in 1992. Wilbanks Harrison (Harrison) also stated that he had been J.B's guardian for forty years, and J.B. did not have any children as far as he knew. However, it was not necessary for J.B. to tell anyone that Rocky was his child to legitimize him once he had signed the Paternity Affidavit in compliance with § 215.

██ ¶ 11 Third, Murphy argues that to qualify as an heir Rocky must provide *separate evidence* of paternity in addition to the paternity affidavit. Separate evidence of paternity is a requirement where legitimacy is being established by *open or public acknowledgment. See Estate of King,* 1990 OK 138, ¶ 13, 837 P.2d 463, 467 (to prove legitimacy by open acknowledgment claimant must prove paternity as a separate element by clear and convincing evidence). Rocky, however, relied solely on the written acknowledgment in compliance with 84 O.S.1961 § 215, which does not require separate evidence of paternity by a test or by open acknowledgment. Several Oklahoma cases have held that a sufficient written acknowledgment is enough to legitimize a child without requiring further evidence of paternity. *See e.g., Parish v. Ned,* 1953 OK 379, ¶ 9–10, 264 P.2d 762, 766 (holding a will clearly acknowledging paternity was sufficient); *Kelly v. Scott,* 1927 OK 171, ¶ 16–17, 257 P. 303, 306 (holding a defective will was sufficient). Further, the policy of the law is to favor legitimacy of children born out of wedlock. *Matter of Swarer,* 1977 OK 53, ¶ 4, 566 P.2d 126, 127. Here, the open and unequivocal written acknowledgment of paternity by J.B. was sufficient evidence of paternity without further evidence.

█ ¶ 12 Finally, Murphy argued that the Paternity Affidavit was void pursuant to 15 O.S.2001 § 24 because J.B. was psychotic, delusional and schizophrenic, and had been under the care of a guardian since he had been declared incompetent in 1947. Section 24 provides:

After his incapacity has been judicially determined, a person of *unsound mind* can make no conveyance or other contract, nor designate any power, nor waive any right, until his restoration to capacity is judicially determined. But if actually restored to capacity, he may make a will, though his restoration is not thus determined.

15 O.S.2001 § 24 (emphasis added).[3]

¶ 13 No Oklahoma statutes or case law define what capacity is required to execute a paternity affidavit or to otherwise acknowledge a child. *Cf., Estate of Schalla*, 2 Wis.2d 38, 86 N.W.2d 5, 8 (1957) (holding that an incompetent person who had sufficient mental ability to know what he was doing and the nature of the act had sufficient capacity to execute effective written acknowledgment of paternity under similar Wisconsin statute). Murphy argues that the statute governing competency to enter a contract should apply, while Rocky argues that no higher competency than testamentary capacity should be necessary. It is not necessary to resolve this conflict, however, because under either standard, there was no evidence presented that J.B. was incapable of executing this paternity affidavit. Taken in the light most favorable to Murphy, the most the evidence can establish is that J.B. had been rated "incompetent" because he was unable to manage his business affairs. There was no evidence that he was insane or delusional or that he did not know the significance of his act of acknowledging paternity.

■ ¶ 14 There is a presumption that every person is sane. *Robertson v. Robertson*, 1982 OK 108, ¶ 34, 654 P.2d 600, 604. Further, § 11 of Title 15 states the general rule that all people are capable of contracting—except minors, persons deprived of civil rights and "persons of unsound mind." 15 O.S.1961 § 11. In 1964, the definition of persons of unsound mind included people who were "idiots, lunatics, and imbeciles." 15 O.S.1961 § 16.

■ ¶ 15 By contrast, if the standard for testamentary capacity is used, Murphy must show that J.B. was unable to understand in general the nature of his act in signing the paternity affidavit. *Matthews v. Pederson*, 1951 OK 201, ¶ 6, 233 P.2d 971, 972. The Oklahoma Supreme Court has emphasized that an adjudication that a person was "incompetent" was not the same as an adjudication of insanity, and there was no presumption that the person did not have testamentary capacity even though he or she was under a guardianship. *In re Nitey's Estate*, 1935 OK 1218, ¶ 12, 53 P.2d 215, 217. Further, the proponents of the will did not have to show a change in the mental condition of the incompetent person. *Id.* at ¶ 17, 53 P.2d at 218–19. The fact that the person was under a guardianship was evidence for the court to consider, but the presumption that every person is sane, coupled with the execution of the will, which was a rational act performed in a rational manner, and supplemented by testimony clearly established a *prima facie* case of testamentary capacity. *Id.* at ¶ 13, 53 P.2d at 217–18. The Court emphasized the distinction between testamentary capacity and business capacity, because even if a person does not have sufficient competence to transact business, he can still have testamentary capacity if he understands the nature and consequences of his acts at the time of the making of the will. *Id.* at ¶ 17, 53 P.2d at 219. Not all people who have been adjudicated incompetent are in the category of "persons of unsound mind." *Id.* at ¶ 18, 53 P.2d at 218. Thus, under either of these standards, Murphy must show more than just a rating of incompetency to show that there was a legitimate controversy regarding J.B.'s capacity to execute the Paternity Affidavit.

¶ 16 In support of her argument that J.B. Gentry was incompetent, Murphy attached an unsigned, uncertified copy of a Certificate of Veterans Affairs from 1947 that stated J.B. was "rated incompetent" and required the appointment of a guardian to release his money. This document would not be admissible because it was not authenticated in any way. *See* 12 O.S. Supp.2002 § 2902. In addition, it did not include any findings of fact or define J.B.'s incompetency, so it is impossible to determine the basis or extent of his disability. Murphy also attached Hettie's petition to appoint a guardian in which she had asked the court to appoint a guardian solely because J.B. was "incompetent to manage his own business affairs ..." The court appointed the guardian in June of 1949 only because J.B. had been "rated incompetent by the Veterans Administration."

---

**3.** This statute has not been amended since J.B. Gentry signed the affidavit in 1964.

¶ 17 Murphy also attached several orders from the Seminole County Court in 1964, 1997, 1998, 1999 and 2001 allowing the guardian's annual report and fees. Each of these orders states that the court examined the Guardian under oath, but they do not state whether J.B. testified as to his competency. Significantly, each order states that "said ward is still incompetent to care for himself and handle his business affairs" and that he should remain under guardianship until further order. Again, the term "incompetent" was never defined, and no evidence of J.B. Gentry's incompetency was provided.

¶ 18 Murphy alleged in her brief that J.B. was insane and delusional. However, she did not produce any evidence in support of this statement, and the testimony of her own daughter and J.B.'s guardian dispute this allegation. Harrison testified in his deposition that he gave J.B. $600 every two weeks, and J.B. would pay his own utilities and buy his own groceries. Harrison only bought major items likes televisions and cars for J.B. Murphy's daughter, Alma Jean Lewis, stated that J.B.'s disability was mental because he was "shell shocked" after the war. In the forties and fifties, the children had to be isolated from him because he was "very nervous" and had unexpected verbal outbursts. However, Lewis stated that J.B. was functional after that time. She stated that J.B. was not in control, but did follow the directions of authority figures. There was no testimony that J.B. required assistance or guidance in handling his personal care or that he was in any type of home or assisted living program when he signed the affidavit in 1964. Instead, the undisputed evidence was that he was able to handle money on a daily basis and was functional by that time, even though he still needed a guardian to handle his major business affairs.

¶ 19 Murphy had the burden of contesting the Affidavit, but failed to present any evidence that J.B. was so incompetent he could not sign a paternity affidavit. The fact that J.B. was adjudged incompetent does not equate with insanity or unsoundness of mind, and there was no evidence that he could not understand the consequences of his act in signing the Affidavit. The evidence was un-disputed that J.B. was able to handle his finances and his personal care on a daily basis. On this record, the trial court's order was legally correct and not against the clear weight of the evidence.

¶ 20 AFFIRMED.

HANSEN, J., and JOPLIN, J., concur.